UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------
JORGE CORONEL, Individually And On Behalf of
All Others Similarly Situated,

     Plaintiff,

               07 Civ. 1405 (RPP)

   - against -        **OPINION AND ORDER**

QUANTA CAPITAL HOLDINGS LTD., ET AL.

     Defendants.
-----------------------------------------------------------

**ROBERT P. PATTERSON, JR., U.S.D.J.**

   On July 16, 2007, Plaintiff Washington State Plumbing and Pipefitting Pension Trust ("WA Trust"), on behalf of those who purchased common stock between October 4, 2005 and April 3, 2006 ("the Class Period"), filed an amended Complaint ("Compl.") in the above-captioned class action against Defendants Quanta Capital Holdings Ltd. ("Quanta" or the "Company"), Quanta's individual officers and directors (James J. Ritchie, Jonathan J.R. Dodd, Robert Lippincott III, Michael J. Murphy, Nigel W. Morris, and W. Russell Ramsey), and the two underwriters (Friedman, Billings, Ramsey & Co. ("FBR") and BB&T ("BB&T")) who underwrote the December 14, 2005 common stock offering by the Company.  The Complaint seeks recovery pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.  See 15 U.S.C. §§ 77k, 77l, 77o.  The Complaint additionally seeks recovery pursuant to Sections 10(b) (Rule 10b-5 promulgated thereunder) and 20(a) of the Exchange Act of 1934.  See 15 U.S.C. §§ 78j(b), 78t(a); 17 C.F.R. 240.10b-5.

   On September 28, 2007 both Quanta (and its individual employees) and the

underwriters each separately filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. Argument was heard by the Court on April 3, 2008.  For the reasons that follow, Defendants' motions are granted, and the Complaint is dismissed.

## 1. The Complaint and Related Public Documents[1]

### A. Quanta

Quanta was incorporated on May 23, 2003 as a Bermuda holding company formed to provide specialty lines of casualty insurance, reinsurance, risk assessment, and risk-consulting services.[2]  (Compl. ¶¶ 26-27.)  After raising approximately $550 million in startup capital through an August 2003 private equity offering, the Company began substantive operations in September, 2003.[3]  (Compl. ¶¶ 26-27, 55-56.) On May 14, 2004, the Company registered the shares sold in the initial private offering and went public on the Nasdaq stock exchange, trading under the ticket "QNTA."  (Compl. ¶ 27.)

The Company's primary business consisted of providing "specialty lines" of insurance and reinsurance for "risks that are often unusual or difficult to place and do not fit the underwriting criteria of standard commercial products."  (Compl. ¶¶ 55-56.)  As a result, Quanta's products "require extensive technical underwriting skills and risk

---

[1] In deciding a motion to dismiss, a court is not limited to the face of the complaint.  Rather, the court may consider the complaint and attached exhibits, statements and documents incorporated by reference, legally required public disclosure documents filed with the SEC, documents possessed by or known to the plaintiff and upon which it relied in bring the suit, and matters subject to judicial notice.  See ATSI Communications, 493 F.3d at 98; Rombach v. Chang, 355 F.3d 164, 169 (2d Cir. 2004); Cortec Industries, Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991).

[2] Defendant Tobey Russ served as the Company's Chairman from inception through November 21, 2005, when he was replaced by Defendant James Ritchie.  (Compl. ¶¶ 31-32.)  During the Class Period, Defendant Robert Lippincott served as Chief Executive Officer, Defendant Dodd served as Chief Financial Officer, and Defendants Michael Murphy, W. Russell Ramsey, Nigel W. Morris served as directors.  (Id. ¶¶ 33, 35-39.)  All seven individual Defendants, save Defendant Russ, signed the Prospectus and Registration Statement.  (Id. ¶ 31.)

[3] In Quanta's August 2003 private equity offering, FBR served as the "sole initial purchaser and exclusive placement agent" for Quanta, earning $38.5 million in fees and retaining a 5% ownership stake in the Company.  (Compl. ¶ 56.)

assessment resources and, in many cases, engineering expertise, in order to be profitably underwritten."   (Declaration of Andrew Ruffino, dated September 28, 2007 ("Ruffino Decl."), Ex. O [Quanta's 2005 Annual Report] at 1, 4.)

   *B. A.M. Best*

   Independent rating agencies ascribe ratings to insurance and reinsurance companies such as Quanta.  (Compl. ¶ 60.)  These ratings are a "critically important metric" with which to evaluate the "overall financial strength of the prospective insurer or reinsurer."  (Id.)  A.M. Best, an independent credit rating company "widely recognized as the preeminent rating agency within the insurance and reinsurance markets," bases its rating on a company's "available and required rated capital" to support its operations. (Compl. ¶¶ 61-62.)  Specifically, a company's A.M. Best rating is derived from its "Best's Capital Adequacy Ratio" or "BCAR" score, which, in turn, is ascertained from an "in-depth evaluation of a company's balance sheet."  (Compl. ¶ 66.)  While taking into account other factors, the BCAR model primarily considers a company's "premium-to-surplus" ratio.  (Id. ¶ 67.)

   A.M. Best assigns one of 16 ratings to insurance companies, ranging from A++ and A+ (superior) and A, A- (Excellent) to B++, B+ (Very good), down to F (in liquidation) and S (suspended).  (Compl. ¶ 62.)  From the time of its founding through March 2006, when Quanta was downgraded, A.M. Best awarded Quanta an "excellent" (A-) rating.  (Compl. ¶ 63.)  As Quanta described in a May 26, 2005 analyst presentation, if the Company let their premium-to-surplus ratio fall below 1.1-to-1, a ratings downgrade from A.M. Best would probably result.  (Id.  ¶¶ 68-69.)  Hence the "amount of surplus dictated the amount of premiums Quanta could underwrite and still retain its

'excellent' rating."  (<u>Id.</u> ¶ 71.)

Maintaining an A.M. Best "excellent" rating was of significant importance for Quanta.  (Compl. ¶ 63.)  In the Company's December 24, 2003 prospectus in connection with its Initial Public Offering, the Company wrote that "a significant ratings downgrade [from A.M. Best] would result in a substantial loss of business as policyholders and ceding companies purchase insurance or reinsurance from companies with higher … financial strength ratings."  (Compl. ¶ 63.)

In the "Risk Factors" section of Quanta's October 27, 2005 Registration Statement for the preferred shares offering, Quanta reiterated these sentiments:

> [a] ratings downgrade would adversely affect our ability to do business … would result in a substantial loss of business … and would also constitute a default under our credit facility and under certain other agreements … Additionally, ceding companies will have the right to terminate a significant portion of our reinsurance treaties below our current rating of A-.  We intend to work closely with A.M. Best to maintain our current A.M. Best rating.  In this regard, we are reviewing our capital structure, developing a capital raising plan and implementing plans to conduct an internal analysis of our technical risk property and property reinsurance lines of business and the efficacy of our catastrophe models over the next few months.

(Compl. ¶¶ 63-65; Ruffino Decl., Ex. E [Form S-3 filed 10/27/05] at 6.)

*C. Losses from the 2004 Hurricane Season.*

Four hurricanes struck the United States during the third-quarter (July to September) of 2004.  (Compl. ¶¶ 76-77.)  In an October 7, 2004 press release, the Company reported $46 million in after-tax net losses from those hurricanes.  (<u>Id.</u> ¶ 77.)  This $46 million loss figure was confirmed one month later in a November 2, 2004 press release.  (<u>Id.</u> ¶ 78.)

On November 3, 2004, the Company held a press conference at which it

explained that it needed to stay within the "mandated 1.1-to-1" premium-to-surplus ratio necessary to maintain an A.M. Best "excellent" rating. (Compl. ¶ 79.) On December 22, 2004, the Company raised $40 million in a private placement offering, and on February 24, 2005, the Company raised an additional $20 million in a second private placement. (Id. ¶¶ 81-82.) This capital infusion enabled the Company to remain within the mandated 1.1-to-1 premium-to-surplus ratio, and A.M. Best reaffirmed Quanta's "excellent" rating.[4] (Id. ¶ 83.) In Quanta's year-end 2004 results released on March 14, 2005, the Company reported an additional $21.3 million in losses stemming from the four hurricanes that struck the United States during the third-quarter of 2004. (Id. ¶¶ 83-84.)

### D. Loss Reserves for Pacific Energy's Oil Pipeline Leak

On May 3, 2005, Defendant Russ reported Quanta's first-quarter 2005 financial results in an analyst conference call. (Compl. ¶ 89.) During that call, Quanta revealed a $5 million increased loss reserve for that quarter, stemming primarily from a ruptured oil pipeline owned by Pacific Energy Partners, a company for which Quanta was the primary insurer. (Id. ¶¶ 89-90.) Because Quanta had purchased reinsurance, its net exposure for the ruptured pipeline, which had caused crude oil to spill into a lake, was 50% of the total loss (up to $25 million). (Id. ¶¶ 89-90, 94.) Due to this spill, the Company recorded a $5 million loss reserve for cleanup costs.[5] (Id. ¶ 90.)

On August 2, 2005, Quanta reported that it had increased the pipeline loss reserve

---

[4] The Complaint contends that if the Company had revealed the true extent of its losses from the third-quarter 2004 hurricanes when it released its third-quarter earnings statement, it would have "breached the mandated 1.1-to-1 premium-to-surplus ratio," thereby "jeopardizing its all-important 'excellent' rating." (Compl. ¶ 84.) It was not until the Company raised additional capital through private placements that it became "safe to reveal the true impact of the 2004 hurricanes." (Id. ¶¶ 84, 87-89.)

[5] Under Statement of Financial Accounting Standards No. 5, companies may book a liability for a loss event only when they have enough information to determine that the loss is both "probable" and "can be reasonably estimated" quantitatively. (Compl. ¶ 3.)

by $2.5 million in the second-quarter of 2005, to a total of $7.5 million.  (Compl. ¶ 95; Ruffino Decl., Ex. C [transcript of 08/02/05 conference call] at 11.)  This increase resulted because even though the "oil that was cleaned up on the surface of the lake was believed to be all the oil that existed," some of that "oil apparently had dropped to the bottom of the lake and then later in the [second-quarter] reemerged," requiring additional clean up.  (Ruffino Decl., Ex. C at 18.)  The initial loss estimate projected by the Company on May 3, 2005 had been its "best estimate at the time."  (Id.)

On November 1, 2005, in a conference call to discuss 2005 third-quarter results, Defendant Russ explained that the pipeline loss was the same as previously reported ($7.5 million), and that the spill cleanup was "substantially complete."  (Compl. ¶¶ 94, 97-98.)  The $7.5 million loss estimate was also included in the November 14, 2005 Form 10-Q the Company filed to report its third quarter 2005 financial results.  (Compl. ¶ 98.)  That same day, Pacific Energy filed its third-quarter 2005 financial reports with the SEC on Form 10-Q.  (Id. ¶ 102.)  In its filing, Pacific Energy reported that it had increased its own expected loss from the pipeline spill by $4.5 million, from $15.0 million in the second quarter of 2005 to $19.5 million in the third quarter.[6]  (Id.)

In Quanta's December 5, 2005 common-stock offering Registration Statement, the Company wrote that "included in our expected ultimate losses during the nine months ended September 30, 2005 is $7.5 million related to damages from a ruptured oil pipeline in California which occurred during the first quarter of 2005."  (Compl. ¶¶ 98-100; Declaration of George Borden, dated September 28, 2007 ("Borden Decl."), Ex. B [Registration Statement] at 60.)  This loss estimate was based on a "detailed review of

---

[6] The Complaint contends that this increase by Pacific Energy necessarily increased Quanta's third-quarter loss by $2.25 million at that moment because Quanta had purchased reinsurance on the pipeline claim and was liable for 50% of gross losses.  (Id. ¶¶ 102-103.)

affected contracts." (Id. ¶ 99.) In a Form 10-Q released on January 10, 2006, Quanta acknowledged $4.9 million in additional net loss expenses related to the pipeline rupture. (Compl. ¶ 101.) The increase was due to "additional remediation costs at the site" and was based on "a specific remediation plan over an estimated period of time." (Ruffino Decl., Ex. M [Form 8-K filed 01/11/06]). The Company reminded investors that the reported losses from the pipeline rupture "remain[ed] an estimate," and that actual losses could "vary significantly from the estimate, for example, if the plan or its estimated time to completion change[d]." (Id.)

### E. Hurricanes Katrina and Rita – Changes in Loss Estimates Over Time

Hurricane Katrina struck Louisiana, Mississippi, and Alabama on August 29, 2005, causing significant destruction with material damages estimated at $16 billion. (Compl. ¶ 105.) On September 24, 2005, Hurricane Rita struck Texas and Louisiana, causing $4-$7 billion in damages, and in October 2005, Hurricane Wilma struck southern Florida. (Compl. ¶¶ 106-108.) Quanta provided insurance and reinsurance coverage for properties in the areas affected by these hurricanes. (Compl. ¶¶ 104-07.)

In an October 4, 2005 press release, Quanta issued its first loss projections related to the hurricanes, reporting that the "retained net losses from hurricanes Katrina and Rita [were] expected to be in the ranges of approximately $40 to $50 million and approximately $2 to $8 million, respectively," or $42-$58 million combined. (Compl. ¶ 109; Ruffino Decl., Ex. D [Form 8-K, Press Release dated 10/4/05].) The press release cautioned that these numbers were only "estimates" based on a "review of [Quanta's] potential exposure to these events" and were not "based on actual reported losses." (Ruffino Decl., Ex. D.) The Company further warned that it would:

> not know our exact losses for some time given the uncertainty
> around the industry loss estimates, the size and complexity of
> hurricanes Katrina and Rita, limited claims data and potential legal
> and regulatory developments related to potential losses.  As a
> result, our loss reserves may vary significantly from those
> disclosed above.

(Id.)

The next day, on October 5, Kenneth Billingsley, an equity research analyst with BB&T, issued a "buy" recommendation for Quanta, writing that while "$84 million in hurricane related losses" was anticipated by the "market," the Company was reporting estimated losses of only $58 million.  (Compl. ¶ 110.)  In a report issued that same day, equity research analyst John Keefe of Ferris Baker noted that the Company's "losses [were] substantial enough that they will likely provoke rating concerns" from A.M. Best, but that such concerns could be "addressed via raising a modest amount of additional capital," which the Company "should be able to accomplish."  (Compl. ¶ 111.)  Keefe's suspicions were confirmed because also on October 5, A.M. Best placed the financial strength of Quanta, which was rated "excellent" (A-), under review with "negative implications."  (Compl. ¶¶ 111-114.)  The price of Quanta's common stock, which had traded at $7.34 on August 24, 2005, prior to the hurricanes, closed at $5.88 on October 5, 2005.  (Compl. ¶¶ 112-13.)

The next day, Quanta responded to A.M. Best's decision to review the Company's rating by discontinuing the writing of new business in the "technical risk property and property reinsurance lines" pending an internal review.  (Compl. ¶ 114; Ruffino Decl., Ex. D.)  The Company also stated that it would review its "capital structure and develop[e] a capital raising plan" to fend off a potential ratings downgrade by A.M. Best.  (Compl. ¶¶ 8-9, 104, 111.)

Three weeks later, on October 26, 2005, Quanta announced additional losses from hurricanes Katrina and Rita, stating that the Company's "total estimated net losses," which would be reflected in the Company's third-quarter results, would be "approximately $68.5 million, including reinstatement premiums."   (Compl. ¶ 116; Ruffino Decl., Ex. F [Form 8-K, Press Release dated 10/26/05]).  Upon the release of this news, Quanta's common stock price, which traded at $4.35 on October 25, 2005, closed at $3.82 on October 27, 2005.  (Compl. ¶ 117.)  The press release emphasized that the aforementioned figures were still "preliminary loss estimates."  (Ruffino Decl., Ex. F.)

> The change in our estimate for hurricanes Katrina and Rita arises out of increases in losses reported by our reinsurance customers and additional information from our loss adjusters in our primary insurance business … We note that there is still substantial uncertainty around all of these estimates and that we will not know our exact losses for some time.  As a result, our loss reserves may move positively or negatively depending upon actual losses reported.

(Id.)

That same day, Quanta filed a shelf-registration form for a preferred shares offering with the SEC.  (Compl. ¶ 116; Ruffino Decl., Ex. E [October 27, 2005 S-3 Form], at 1.)  The shelf-registration statement reiterated that the estimated net loss from hurricanes Katrina and Rita was $68.5 million (Ruffino Decl., Ex. E at 7.)   These estimates were the Company's "best estimates based on all the information" the Company had "to date," and the estimates were "derived from a review of [the Company's] potential exposure to these events and [were] not based on actual reported losses."  (Ruffino Decl., Ex. E at 7.)  The shelf-registration form acknowledged that the hurricanes from 2004 and 2005 have had a "material adverse effect" on the Company's business, and it warned about reporting lags, stating that "there always exists a reporting

lag between a loss event taking place" and "the reporting loss" to Quanta, and that these "reported losses [were] inherently difficult to predict" because the "property catastrophe market [was] inherently complicated."  (Ruffino Decl., Ex. E at 8, 11.)

During the Company's November 1, 2005 third-quarter earnings conference call, Defendant Dodd, Quanta's CFO, reiterated that the Company's statements of "total loss impact for Katrina and Rita was $68.5 million."  (Compl. ¶ 119.)  In that call, Defendant Dodd stated that:

> The estimates we have right now are our best estimates based on all the information we have to date.  We've been naturally very conservative, continue to be very aggressive in getting a hold of information, which has proved difficult getting access into New Orleans and the various curfews and flood damages did make it difficult.  We continually review where we're at.  We're actively pursuing information.  But we believe the numbers we have right now are solid.

 (Ruffino Decl., Ex. G at 23 [transcript of 11/01/05 earnings call].)

During that same call, Quanta explained that because it had been put on a "watch" list with negative implications by A.M. Best, it was working to reduce its "exposure to catastrophe," while also raising capital.  (Compl. ¶ 119.)  These steps were "intended to have [the Company's] current 'A-' rating reaffirmed." (Id.)

Two weeks later, on November 14, 2005, Quanta filed a third-quarter earnings report, listing the same "estimated net [hurricane-related] losses" of approximately $68.5 million.  (Compl. ¶ 121; Ruffino Decl., Ex. H [Form 10-Q filed 11/14/05] at 24.)  The report stated that this figure was subject to "significant uncertainty" because the Company had "received a limited number of claim notifications relating" to the hurricanes.  (Ruffino Decl., Ex. H at 32, 35-36.)  The $68.5 million amount was the "Company's best estimate of losses based upon information currently available," and it

was derived from a "detailed review of affected contracts and discussion with clients, cedants and brokers" as well as "industry loss estimates." (Ruffino Decl., Ex. H at 13, 32, 35; Compl. ¶ 160.)  The Company also stated, in numerous places, that the "actual amount of losses from the hurricanes may vary significantly from the estimate," and that the Company "participate[s] in lines of business where claims may not be reported for some period time after those claims are incurred." (Ruffino Decl., Ex. H at 32, 35-36, 39-40, 49, 56.)

On December 5, 2005, Quanta filed a Registration statement for the secondary offering of approximately eleven million shares of common-stock (Ruffino Decl., Ex. I [Registration Statement filed 12/05/05]), and on December 7, 2005, the Company filed an amended Registration Statement related to that same offering. (Ruffino Decl., Ex. J [S-3/A Statement filed 12/07/05].)  Nine days later, on December 16, 2005, Quanta filed a "Definitive Prospectus Supplement" for the secondary offering of common stock (Ruffino Decl., Ex. K [Prospectus for Common Stock Offering filed 12/16/05; Borden Decl., Ex. B [same]).

The offering documents repeated the $68.5 million "estimate" for the 2005 hurricane losses. (Compl. ¶ 122; Ruffino Decl., Exs. J at 14; K at 14.)  The offering documents explained that the estimate was based upon "a combination of a review of in-force contracts and preliminary loss information from our clients, brokers and loss adjusters and the output of industry models," and were "not based on actual reported losses," but rather were "derived from a review of [the Company's] potential exposure to these events." (Ruffino Decl., Exs. J at 2, 17; K at 2, 17,  94.)  The net estimated loss reserves figures took "into account the receipt of anticipated recoverable amounts under

reinsurance and retrocessional agreements and the effects of reinstatement premiums."

(Ruffino Decl., Ex. J at 17.)   The Prospectus further explained that the Company's

estimate of its:

> unpaid exposure to ultimate claim costs associated with these losses is
> based on currently available information, claim notifications received to
> date, industry loss estimates, output from industry models, a detailed
> review of affected contracts and discussions with clients, cedants and
> brokers.

(Compl. ¶ 160.)   And in the "Risk Factors" section of the Prospectus and Registration

Statement, the Company stated that the:

> Estimate of net losses is subject to a high level of uncertainty due to the
> unprecedented nature of the catastrophe, complex coverage and regulatory
> issues and the unknown impact of such losses on our reinsurers.   Our
> actual losses from Hurricanes Katrina and Rita may differ materially from
> our estimated losses.   If our actual losses from Hurricanes Katrina and
> Rita are materially greater than our estimated losses, our business, results
> of operations and financial condition could be materially adversely
> affected.

(Ruffino Decl., Exs. J at 14, 49; K at 14, 94.)   The offering documents further explained

that:

> We believe that we will not know our exact losses for some time given the
> uncertainty around the industry loss estimates, the size and complexity of
> Hurricanes Katrina, Rita and Wilma, limited claims data and potential
> legal and regulatory developments related to potential losses.   As a result,
> our losses may vary significantly from our recorded estimates.

(Ruffino Decl. Ex. K at 17, J at 40, 49, 86-87.)   The Prospectus reiterated that

"[s]ignificant periods of time often elapse between the occurrence of an insured loss, the

reporting of the loss to an insurer and payment by the insurer of that loss."   (Ruffino

Decl. Ex. K at 16-17.)   Thus, loss reserves were "only estimates," as estimating loss

reserves was a "difficult and complex process involving many variables and subjective

judgments.[7]  (Id.)  Further, the offering documents noted:

> [T]here always exists a reporting lag between a loss event taking place and the reporting of the loss to us.  These incurred but not reported losses are inherently difficult to predict.  Because of the variability and uncertainty associated with loss estimation, it is possible that our individual case reserves for each catastrophic event and other case reserves are incorrect, possibly materially.

(Ruffino Decl., Exs. J at 17; K at 17.)

On January 11, 2006, in the same Form 10-Q in which the Company reported additional losses related to the ruptured pipeline, the Company reported the "receipt of approximately $3.0 million in additional recovery" for losses related to Hurricane Rita. (Ruffino Decl., Ex. M.)  This reinsurance recovery was recognized in the fourth quarter of 2006.  (Id.)  The Form 10-Q warned, however, that reported estimated losses would "continue to be estimates which are subject to a high level of uncertainty due to the unprecedented nature of the catastrophes, complex coverage and regulatory issues and the unknown impact of such losses to its reinsurers."  (Id.)  As a result, "actual losses from these hurricanes may differ significantly from estimated losses."  (Id.)

On March 2, 2006, Quanta disclosed preliminary results for 2005 in a press release, which included "$10.2 million of additional (fourth-quarter of 2005) costs related to hurricanes Katrina and Rita," as well as $5.5 million related to a previously reported environmental loss and $8-13 million of additional general reserve strengthening. (Ruffino Decl., Ex. N [March 8, 2005 press release] at 2, 6); Compl. ¶¶ 157-59.)  The hurricane related losses were approximately 15% higher than previously estimated.

---

[7] In the Prospectus, the Company explained that loss reserves represented the Company's "best estimate, at a given point in time, of the ultimate settlement and administration cost associated with incurred claims." (Quanta's 12/16/05 Prospectus at 109).  The Company warned, however, that its "ultimate liability may exceed or be less than these estimates" because "the process of estimating loss reserves requires significant judgment due to a number of variable … internal and external events, such as fluctuations in inflation, judicial trends, legislative changes and changes in claims handling procedures, will affect these variables." (Id.)

(Ruffino Decl., Ex. N at 10.)  As the Company explained in an analyst conference call that morning, the hurricane-related additional losses were due to a $17.4 million "business interruption claim from a single offshore energy account," which came to Quanta's attention in "early 2006."  (Compl. ¶ 159; Ruffino Decl., Ex. N at 10, 15.) Subsequent to this disclosure, the Company's common stock price dropped from $4.73 to $2.83.  (Compl. ¶ 165.)

The Company further explained that it was "difficult to get a handle on the business interruption," and that as of "Q3 and indeed through December 31," the Company had not "received any information on that account," and "applied actuarial estimates based on similar events in the past … proved to be not conservative enough." (Compl. ¶ 159.)  The Company did see, however, "favorable development of $5.5 million" related to its "reinsurance property book and technical risk property book" stemming from the hurricanes.  (Ruffino Decl., Ex. N at 15.)

In a March 2, 2006 conference call held to discuss the 2005 year-end results, investment analyst Ron Bobman argued that it was "hard to sort of establish confidence in new management" when the Company had held an investor road show in "late November" of 2005, and at that road show Company management had stated that the Company had "scrubbed the reserves," implying that it had taken a close look at the reported losses from the hurricanes.  (Compl. ¶ 163-64.)

F. The December 2005 Registration Statement and Prospectuses.

In the Registration Statement filed in connection with the common-stock offerings, the Company warned investors that being "under review with negative implications" by A.M. Best was a risk factor, because this could lead to a ratings

downgrade that would "materially and adversely affect our ability to execute our business strategy and our competitive position resulting in a substantial loss of business and business opportunities …" (Ruffino Decl., Ex. J at 14-15, 21-22.)   The Registration Statement also pointed out that the Company derived a "significant portion" of business "from a limited number of brokers, and that brokers rely on A.M. Best ratings to assess the quality of insurers with whom they might place business." (Id.)  Further, the offering document acknowledged that the hefty losses incurred by Quanta due to the 2004 and 2005 hurricanes "have had, and future catastrophic events may have," a materially adverse effect on the Company's "ability to write new and renewal business and our results of operations and financial condition."  (Ruffino Decl., Ex. J at 14-15.)

On December 16, 2005, less than two weeks before the end of the fourth-quarter, Quanta filed a Prospectus in connection with its offering of common-stock, and the Prospectus incorporated the Registration Statement for the offering in full.[8]  (Compl. ¶ 122.)  That day, the Company priced approximately eleven million shares of common stock at $4.75 per share.  (Id. ¶¶ 124-25.)  FBR, which in November 2005 owned 5% of Quanta's shares, was the lead underwriter of the offering and it performed a due diligence investigation of Quanta and participated in the preparation of the Prospectuses.  (Compl. ¶ 42.)  BB&T Capital was the co-underwriter of the offerings, and also performed a due diligence investigation of Quanta.  (Compl. ¶ 43.)

In addition to the aforementioned warnings, the Prospectus stated that the common-stock offering would increase the Company's "available rated capital" and help "maintain [its] current rating with A.M. Best."  (Ruffino Decl., Ex. K at 15-16.)  The

---

[8]

Prospectus reiterated the importance of A.M Best's rating to Quanta's business, stating that the rating was "an increasingly important factor in maintaining the competitive position" of Quanta's "insurance and reinsurance" businesses.  (Ruffino Decl. Ex. K at 15.)  The Company was "working closely with A.M. Best" to maintain its current "excellent" 'A-' level, and the Company believed that upon raising such capital, A.M. Best would "conclude its review, [and] remove Quanta from negative watch."  (Id.)

### G. A.M Best Downgrading

On December 21, 2005, after completion of the secondary offering, A.M. Best affirmed the "A-" financial strength rating of Quanta, although it ascribed a negative outlook to the rating.  (Compl. ¶ 126.)  The capital raising was a "key recent development" for why A.M. Best maintained Quanta's "excellent" rating.  (Compl. ¶ 126.)  On March 2, 2006, after Quanta reported preliminary results from the fourth-quarter and full-year ended December 31, 2005, which included the adverse developments related to the 2005 hurricanes, A.M. Best downgraded Quanta's finance strength ratings from A- to B++, and its issuer credit ratings from A- to BBB-.  (Compl. ¶¶ 158, 167.)  The ratings downgrade was due to "unexpected loss reserve development" from Hurricanes Katrina and Rita, as well as "other actuarial reserve adjustments and reported charges."  (Compl. ¶ 167.)  As stated earlier, that day the Company's common-stock price declined from $4.73 to $2.83.  (Compl. ¶ 165.)

### H. Disclosures Concerning the Company's Internal Controls.

In the Form 10-K annual report it filed with the SEC on March 31, 2006, Quanta reported that it had carried out an evaluation of the effectiveness of its disclosure controls and processes covering the period leading up to December 31, 2005.  (Compl. ¶¶ 168,

179.)  The evaluation identified material weaknesses in internal controls over financial reporting.  Specifically, the evaluation determined that 1) Quanta "did not maintain" enough personnel with appropriate accounting skills in its financial reporting function; 2) the Company relied too much on spreadsheets requiring the manual input of data and formulas; and 3) the company did not maintain effective controls over the reconciliation of accounts for various revenue and expense categories.  (Compl. ¶ 168.)  The report explained that "as a result of the material weaknesses described above, management concluded" that the Company's "internal control over financial reporting was not effective as of December 31, 2005."  (Id.)  However, the report noted, the "control deficiency did not result in an adjustment to [the Company's] 2005 consolidated financial statements."  (Id.)  The Company concluded by noting that it was "implementing" a "remediation plan to address the material weaknesses," and the Company "expect[ed] this plan [to] extend into fiscal year 2007."  (Ruffino Decl., Ex. O at 143.)  Following these March 31, 2006 revelations, Quanta's common stock price dropped 10%, from $3.00 to $2.68.  (Compl. ¶ 169.)

        *I. Disclosures Concerning Aon*

        In the "Risk Factors" section of the Prospectuses, Quanta acknowledged that its business was "dependent upon [a limited number of] insurance and reinsurance brokers," and that its "failure to develop or maintain important broker relationships could materially adversely affect" the Company's business.  (Compl. ¶¶ 128-31; Ruffino Decl., Ex. K at 21-22.)  The Company further identified Aon Corporation as one of its brokers, and according to a confidential source who was a Vice-President in "one of Quanta's specialty insurance line groups from September 2003 through June 2006," Aon was

Quanta's "second largest" insurance broker.  (Compl. ¶¶ 129-132, 134, 139; Ruffino

Decl. Ex. K at 21-22.)

Citing a number of confidential sources who worked within Quanta's upper

management in New York, the Complaint alleges that prior to the December 2005

secondary offering of common stock, Aon "terminated its brokerage relationship with

Quanta by removing the Company from Aon's 'approved listing' of insurers which Aon"

recommends to its customers.  (Compl. ¶¶ 132-150.)  Quanta first disclosed that it had

been dropped from Aon's list of approved brokers in its 2005 year-end 10-K filed on

March 31, 2006, when it stated that:

> As a result of the downgrade of our financial strength rating by A.M. Best,
> we have been removed from the approved listing from several of our
> important brokers, including Aon Corporation and Marsh Inc.   The
> approved listing is a list of insurance carriers that brokers are allowed to
> recommend to provide insurance coverage to the brokerage house's
> clients.   The downgrade of our financial rating or the continued
> qualification of our current rating could continue to cause concern about
> our viability among brokers and other marketing sources, resulting in a
> movement of business away from us to other stronger or more highly rated
> carriers.

(Compl. ¶¶ 151, 166; Ruffino Decl., Ex. O at 13.)

On April 3, 2006, the trading day subsequent to when Quanta released the news

concerning Aon, the Company's common-stock price fell 10%, from $3.00 to $2.68.

(Compl. ¶¶ 151, 169.)

## II. Legal Standards on a Motion to Dismiss

In considering a motion to dismiss pursuant to Federal Rule of Civil Procedure

12(b)(6) for failure to state a claim upon which relief can be granted, a court must accept

all of the allegations set forth in the complaint as true, and must draw all reasonable

inferences in favor of the plaintiff.  Halperin v. eBanker USA.Com, Inc., 295 F.3d 352,

356 (2d Cir. 2002); Kalnit v. Eichler, 264 F.3d 131, 137 (2d Cir. 2001).   A court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient."  Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).

To be legally sufficient, and therefore survive a motion to dismiss, the complaint must provide "plausible grounds" for the allegations with "enough fact to raise a reasonable expectation that discovery will reveal evidence" to support them.  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007); ATSI Communications v. Shaar Fund, 493 F.3d 87 (2d Cir. 2007) (applying Twombly in context of securities fraud case).  Twombly "require[es] a flexible 'plausibility standard,' which obligates a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible."  Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007).  The question is whether the pleading alleges "enough facts to state claim for relief that is plausible on its face."  Patane v. Clark, 508 F.3d 106, 111-12 (2d Cir. 2007) (quoting Twombly, 127 S. Ct. at 1975)).

## III. Application

The Complaint claims both a Securities Act and a Securities Exchange Act violation.  Its Securities Act claims are a Section 11 claim against all Defendants save Defendant Russ, a Section 12(a)(2) claim against Defendants Quanta, FBR, and BB&T, and a Section 15 claim against Defendants Lippincott and Dodd.  (Compl. ¶¶ 200-227.)  These Securities Act of 1933 claims are premised on three sets of allegedly false and misleading statements contained in the December common-stock offering Registration Statement and Prospectus.

First, the offering documents stated that Quanta's estimated losses related to hurricanes Katrina and Rita were $68.5 million, and that this estimate was "primarily based on claims received to date, industry loss estimates, a review of affected contracts and discussion with cedants and brokers"; the Complaint charges that this estimate was materially false and misleading because at the time the offering documents were filed the Company knew or should have known about an additional $17.4 million business interruption claim related to a single offshore energy account damaged by Hurricane Rita. (Id. ¶¶ 192, 195.)  Second, the offering documents stated that Quanta's estimated loss in connection with the Pacific Energy pipeline spill was $7.5 million, but the Complaint alleges this estimate false and misleading because Pacific Energy had reported an increase in its own pipeline spill-related loss in November 2005.  (Id. ¶ 196.)  Third, as a result of Quanta's allegedly false loss estimates related to the hurricanes and pipeline, the Complaint concludes that Quanta's consequent third-quarter 2005 financial statement, which relied upon those estimates, was therefore comprised of false and misleading statements of after-tax net loss, loss ratio, and total shareholder equity.  (Id. ¶ 193.)  The Complaint also asserts that Quanta made a material omission in the offering documents, charging that the Company had neglected to inform investors that Aon Corporation, one of its brokers, had dropped Quanta from its approved insurers list.  (Id. ¶ 198-99.)

The Securities Exchange Act claims rely on press releases and other disclosures put out by the Company from October 4, 2005 up to the time of the secondary offerings. The Complaint asserts a claim against Quanta and Defendants Russ, Lippincott, and Dodd, for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, alleging that the price of Quanta common stock

was artificially inflated during the October 4, 2005 and April 3, 2006 Class Period, and also seeks to hold Defendants Russ, Lippincott, and Dodd liable as controlling persons under Section 20(a) of the Exchange Act.  (Compl. ¶¶ 267-80.)  The Complaint's fraud claims are premised on allegedly false and misleading statements Quanta made concerning the hurricane and pipeline loss reserves (Id. ¶¶ 89-103, 104-123, 170-178, 185-89), the nondisclosure of the Company's removal from Aon's "approved listing" (Id. ¶¶ 128-149, 151, 197-199), and the nondisclosure of Quanta's internal control problems. (Id. ¶¶ 168, 178-79.)

A. <u>The Complaint's 1933 Securities Act Claims</u>

    1. <u>Applicable Law</u>

To establish a claim under Section 11 of the 1933 Securities Act, a complaint must allege that: 1) a defendant is a signer of a registration statement or a director of the issuer or an underwriter for the offering; 2) the plaintiff purchased the registered securities; and 3) any part of the registration statement for the offering contained an untrue statement of a material fact or omitted to state a material fact necessary to make the statements not misleading.  15 U.S.C. § 77k(a); <u>In re Initial Public Offering Sec. Litig.</u>, 471 F.3d 24, 43 (2d Cir. 2006).  An untrue statement of fact is material only when there is a substantial likelihood that a reasonably prudent investor would consider it important in making a decision.  <u>Kronfeld v. Trans World Airlines, Inc.</u>, 832 F.2d 726, 731 (2d Cir. 1987).  An omission is material where it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  <u>TSC Indus., Inc. v. Northway, Inc.</u>, 426 U.S. 438, 449 (1976).

Relatedly, a claim under Section 12(a)(2) of the 1933 Act is established when a

complaint proves that 1) defendants sold or offered a security, 2) by means of a prospectus, 3) that included an untrue statement of material fact or omitted a material fact necessary to make such statements not misleading. 15 U.S.C. § 77l(a)(2).   When a prospectus incorporates a registration statement as it does here, only the prospectus or registration statement need contain a material misstatement or omission for liability to attach under both sections.  See Steinberg v. PRT Group, Inc., 88 F. Supp. 2d 294, 299-300 fn. 4 (S.D.N.Y. 2000).

To plead a claim under Section 15 of the Securities Act, a complaint must allege 1) a primary violation of the Act, and 2) direct or indirect control by the defendant of the violator.  See Garber v. Legg Mason, 537 F. Supp. 2d 597, 610 (S.D.N.Y. 2008); In re Adelphia Communications Corp., 2007 U.S. Dist. LEXIS 66911, at *10 (S.D.N.Y. 2007).

A plaintiff may establish Section 11 and 12(a)(2) claims by alleging only negligence.  Rombach, 355 F.3d at 171-72.  Where the underlying allegations sound solely in negligence, the applicable pleading standard is set forth in Rule 8(a), under which, a "complaint is sufficient if it alleges [plausible grounds] that the registration statement contains a material misstatement or omission."  In re Initial Public Offering, 358 F. Supp. 2d at 206; see also Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007) (to survive a motion to dismiss, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief").

2. Losses from Hurricanes Katrina and Rita

a. *Alleged Falsity of Loss Estimate for Hurricanes Katrina and Rita.*

The central allegation contained in the Complaint concerns Quanta's allegedly false statement in the December 2005 offering documents that the Company's

preliminary estimate of losses related to Hurricanes Katrina and Rita was $68.5 million, and further, that this estimate was "primarily based on claims received to date, industry loss estimates, a review of affected contracts and discussions with cedants and brokers." (Compl. ¶¶ 191-92, 195.)  This figure, as noted, was revised upward by the Company by $10.2 million in a March 2, 2006 press release, two and a half months after the common-stock offering was completed, when the Company announced an additional "business interruption claim" of $17.4 million that stemmed from a "single offshore energy account … dat[ing] back to Hurricane Rita."  (Compl. ¶¶ 157, 160.)  The Complaint charges that since the loss estimate in the December 2005 offering documents was the same as that released in the October 25, 2005 press release and repeated in the Company's November 1, 2005 third-quarter results, the Company, in the interim period between the estimate's release and the December filing, must have received or been made aware of reports or information that provided the Company with notice of the business interruption claim stemming from the "single offshore energy account."  (Compl. ¶¶ 160-161.)

     In support of this allegation, the Complaint highlights the fact that hurricanes Katrina and Rita occurred on August 29, 2005 and September 24, 2005, respectively, and that the Company released its $68.5 million loss estimate a month after Rita, on October 26, 2005.  (Compl. ¶¶ 104-116.)  The Prospectus was released on December 14, 2005, and the "almost two months" that passed between when the $68.5 million estimate was released to when the offering documents were printed, the Complaint alleges, provided the Company with "adequate time to test and adjust the adequacy of the loss reserves." (Compl. ¶ 122.)  An inference of falsity in the $68.5 million loss estimate is presumed, the Complaint states, because the Company admitted in its 2005 10-K, which was

released on March 31, 2006, that the Company suffered "material weaknesses" in its "disclosure controls and procedures, such that there could be no 'reasonable assurances that information required to be disclosed' was in fact disclosed 'within the time periods specified in applicable rules' or accumulated and communicated in a manner to 'allow timely decisions regarding required disclosure.'"  (Compl. ¶¶ 168, 194.)  In essence, the Complaint alleges that due to the fact that the Company was experiencing "material weaknesses" related to its "internal control over financial reporting" at the time when the loss estimates were announced, the significant time lag between when loss estimates were first released and when the estimates were later revised demonstrates that the estimates were false and misleading.  (Compl. ¶ 194.)

The Complaint disavows any reliance on fraud in this Securities Act claim (Compl. ¶¶ 201, 210), and indeed, the aforementioned reasons provided by the Complaint concerning why the hurricane loss estimate was false do not directly sound in fraud. Further, there is no assertion that Defendants had knowledge of the material weaknesses in financial reporting at the time the statements were made.  Accordingly, the sufficiency of the Complaint is judged under the more lenient plausibility pleading standards of Rule 8(a).  See In re Prestige Brands Holding, Inc., 2006 U.S. Dist. LEXIS 46667, at *8-9 (S.D.N.Y 2006) (because plaintiffs "disclaim any intention to plead fraud except with respect to the Rule 10b-5 claims" and because the complaint does not directly sound in fraud, Rule 8(a) applies).  However, even under the lenient pleading standards of Rule 8(a), these allegations are insufficient to support falsity under Sections 11 and 12(a)(2) of the Securities Act.

The relevant inquiry under the Securities Act is not whether the estimate disclosed

in the offering documents later turned out to be correct, but rather whether the facts alleged in the Complaint evince that the Company knew or had reason to believe, at the time the Prospectus and Registration Statement were filed, that the statement was untrue. In re Flag Telecom Holdings, Ltd. Sec. Litig., 352 F. Supp. 2d 429, 447 (S.D.N.Y. 2005) ("truth of a statement made in the prospectus is adjudged by the facts as they existed when the registration statement became effective"); In re Initial Pub. Offering Sec. Litig., 358 F. Supp. 2d 189, 205 (S.D.N.Y. 2004) (same); see also In re MobilMedia Sec. Litig., 28 F. Supp. 2d 901, 924 (D.N.J. 1998) ("Section 11 and Section 12(a)(2) claims must allege material misrepresentations or omissions based upon the facts as they existed at the time of the offering").

Here, the Complaint puts forth no factual allegations contradicting the veracity of the $68.5 million loss estimate at the time that estimate was released in December 2005. Rather, the Complaint relies on the fact that Quanta revised its preliminary estimate of losses on March 2, 2006, months after the offering documents were filed, and further, that in a report released on March 31, 2006, management concluded that internal controls were not effective as of December 31, 2005.  The Complaint cannot sufficiently allege falsity just because: 1) the mid-December estimate was revised upward by 15% due to the discovery of a single business interruption claim more than two months later, and; 2) in an evaluative report released almost a month after the loss estimates were revised, management announced that its internal financial controls were not effective as of December 31, 2005.

Moreover, any conclusion that the $68.5 million hurricane loss estimate was untrue at the time the offering documents were filed is belied by the fact that the entirety

of the increase in losses resulted from the discovery of a single business interruption claim.  Obviously, the Complaint's allegation that the initial hurricane loss estimate was false would be on firmer ground if the Company subsequently discovered multiple "missing" claims.  But here, the Company was belatedly made aware of a single claim.  And the nature of the claim -- a business interruption after Hurricane Rita to an offshore energy account located in the Gulf of Mexico -- is consistent with the delayed filing of the claim until the full amount of the business losses could be accurately ascertained.

This case is similar that of Kinder v. Acceptance Insurance Cos., 423 F.3d 899, 903 (8th Cir. 2005), which resulted in the dismissal of the Securities Act claims.  In that case involving an insurer, the company maintained reserves involving a claim at a certain level at the time of the registration statement, but subsequently increased the reserves.  Based on the subsequent augmentation of the reserves, the complaint alleged that the disclosures in the registration statement had been false.  The Eighth Circuit ruled that even under Rule 8(a) pleading the complaint was insufficient because it relied on disclosures made after the registration statement was issued to suggest that the disclosure in the registration statement was false at the time it was made.  As the Court observed, "this type of retrospective analysis of awareness cannot be the basis for a claim."  Id. at 903-04; see also In re CIT Group, Inc. Sec. Litig., 349 F. Supp. 2d 685, 691 (S.D.N.Y. 2004) (rejected Section 11 and 12(a)(2) claims where complaint alleged falsity simply because the defendants increased loss reserves three weeks after completing an initial public offering); Scibelli v. Roth, 2000 U.S. Dist. LEXIS 790 (S.D.N.Y. 2000) (it is "not a reasonable inference" to assume prior knowledge based upon actual knowledge at a later date); Hinerfield v. United Auto Group, 1998 U.S. Dist. LEXIS 10601, at *22

(S.D.N.Y. 1998) ("the failure to anticipate the necessary reserves, even if it amounts to mismanagement, is not actionable under federal securities laws"); Shapiro v. UJB Fin. Corp., 964 F.2d 272, 283 (3d Cir. 1992) ("it is not a violation of securities laws to simply fail to provide adequate loan loss reserves").  Indeed, the Complaint's allegations of falsity in the initial estimate are negated by the fact that insurance reserves established for losses that have been incurred but not yet reported to an insurance company are, by their nature, "extremely conjectural, and may need adjustment as time passes and their accuracy can be tested in retrospect."  Stephens v. National Distillers & Chem Corp., 6 F.3d 63, 65 (2d Cir. 1993).

Lastly, the Complaint alleges that the $68.5 million estimate had to be false because the Company was experiencing internal control problems over its financial reporting.  But the hurricane loss estimates at issue were recorded in the third-quarter of 2005, and therefore, reflected in the Company's 2005 year-end financial results. And while the Complaint highlights these control problems, that fact of the matter is that these deficiencies, as explained in more detail, infra, "did not result in an adjustment to [Quanta's] 2005 consolidated financial statements."  (Compl. ¶ 168(3)).  Thus, as the control problems did not result in the revision of the previously disclosed hurricane loss estimates, there is no basis for the Complaint's allegation that the estimate was false because of subsequently discovered control problems.  Put differently, the Complaint has failed to show any link between the control problems and the revised hurricane loss estimate.

b. *Application of Rule 9(b) to the Complaint's Securities Act Allegations.*

The Complaint specifically disavows any reliance on fraudulent conduct in

connection with its Securities Act claims.  (Compl. ¶¶ 201, 210.)  However, at the same time, the Complaint highlights a statement made in the offering documents -- that the hurricane loss estimates were "primarily based on claims received to date, a detailed review of affected contracts and discussion with clients, cedants and brokers" -- and from that argues that it "strains credulity that a 'detailed review of affected contracts' would have overlooked such an enormous claim on a single offshore energy account that exposed *at least* $17.4 million of the Company's capital … from a business interruption claim resulting from a hurricane that struck nearly six months before Quanta ever reported the loss to investors."  (Compl. ¶¶ 161, 195) (emphasis in original.)   The Complaint also charges that the Company possessed an incentive to falsify loss estimates in order to maintain an "excellent" rating from A.M. Best.  (Compl. ¶¶ 111, 114-115, 120.)

These allegations, which the Complaint relies upon to support its Securities Act claims (Compl. ¶¶ 195-95), infer an intent to defraud, and are therefore subject to the heightened pleading requirements of Rule 9(b).  See Rombach, 355 F.3d at 171 (Rule 9(b) applies to fraud claims brought under Section 11 or Section 12(a)(2) of the Securities Act of 1933).  The Complaint cannot escape this pleading standard by disclaiming any reliance on fraud while simultaneously alleging fraud to support their allegations.  See Rombach, 355 F.3d at 172 (plaintiffs' bald assertion that their Section 11 claims "do [ ] not sound in fraud" are not enough to avoid application of Rule 9(b) where "the wording and imputations of the complaint are classically associated with fraud."); In re Axis Capital Holdings Ltd., 456 F. Supp. 2d 576, 598 (S.D.N.Y. 2006) ("Courts have repeatedly noted that the insertion of a simple disclaimer of fraud is insufficient" to avoid

Rule 9(b) standards when Securities Act claims sound in fraud); see also Ladmen Partners v. Globalstar, 2008 U.S. Dist. LEXIS 76670 (S.D.N.Y. 2008) (ultimate question in determining whether Rule 9(b) applies to Securities Act claims is whether the complaint, at its core, is predicated on allegations of fraudulent conduct).

Rule 9(b) requires that, whenever a complaint contains allegations of fraud, the circumstances constituting fraud must be stated with particularity.  See Fed. R. Civ. P. 9(b); Chill v. Gen. Elec. Co., 101 F.3d 263, 267 (2d Cir. 1996); In re Initial Public Offering, 358 F. Supp. 2d at 207-08 (quoting Rombach, 355 F.3d at 170)).  To survive a motion to dismiss, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Rombach, 355 F.3d at 170; Shields v. Citytrust Bancorp. Inc., 25 F.3d 1124, 1128 (2d Cir. 1994) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).  Put differently, a complaint must convey through factual allegations that the defendants made materially false statements, and that they did so with scienter.  In re JP Morgan Securities Litig., 363 F. Supp. 2d 595, 618 (S.D.N.Y. 2005); In re Revlon Sec. Litig., 2001 U.S. Dist. LEXIS 3265, at *7 (S.D.N.Y. 2001).  "Allegations that are conclusory or unsupported by factual assertions are insufficient."  ATSI, 493 F.3d at 98 (citing Luce v. Edelstein, 802 F.2d 49, 54 (2d Cir. 1986)).  The Complaint here does not meet the heightened pleading requirements of Rule 9(b).

Initially, while the Complaint charges that a detailed review of the contracts and discussions with clients would have necessarily warned the Company that its hurricane losses would exceed $68.5 million, it fails to reference a single document or discussion

that the Company had which would have warned the Company that its loss reserve estimate was inadequate at the time when the offering documents were filed.   As the Second Circuit has recently stated, "[a]llegations that are conclusory or unsupported by factual assertions are insufficient" under Rule 9(b).   ATSI Communications v. Shaar Fund, 493 F.3d 87, 98 (2d Cir. 2007).   Put differently, the Complaint charges that the Company had access to facts demonstrating its knowledge of the inaccuracy of the $68.5 million hurricane loss estimate.   But the Second Circuit has determined that "[w]here plaintiffs contend [that] defendant had access to contrary facts, they must specifically identify the reports or statements containing this information."   Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000).   By not specifying what those contrary facts were, the Complaint fails to meet this standard.

Further, while the Complaint alleges fraud based on the Company's desire to maintain an "excellent" rating from A.M. Best, a motive to maintain a financial rating to protect the viability of the Company is not sufficient, under the law of this Circuit, to establish a motive to commit fraud.  See San Leandro v. Philip Morris, 75 F.3d 801, 814 (2d Cir. 1996) ("company's desire to maintain a high bond or credit rating" does not establish motive to commit fraud, for such motive would subject every company that experienced a stock price downtown to securities fraud liability).

Moreover, while the crux of this allegation is that Quanta systematically underestimated the Company's loss reserves to maintain an A.M. Best "excellent" rating, the factual record evinces that Quanta both underestimated and overestimated its hurricane-related losses prior to arriving at its revised estimate on March 2, 2006.  In that regard, on January 10, 2006, the Company disclosed that it had overestimated its loss

reserves related to the hurricanes by $3.0 million.  (Ruffino Decl. Ex. M.)  And on March 2, 2006, while the Company announced a further $17.4 million loss from a single offshore account related to Hurricane Rita, the Company also reported that it had again overestimated one aspect of its hurricane losses by $5.5 million.  (Ruffino Decl. Ex. N.)  Clearly, if the Company had full knowledge of all hurricane-related claims and was intentionally hiding losses to maintain an adequate premium-to-surplus ratio, as the Complaint alleges, it would not have overstated loss estimates as well.  This evinces that the disclosed estimates in the Prospectus and Registration Statement were just estimates, and not fraudulent loss reserve statements designed to maintain a favorable rating.

Accordingly, the Complaint's Securities Act of 1933 claims that sound in fraud are dismissed for lack of particularity.

       c. *The Hurricane Loss Estimate is Protected by the Bespeaks Caution Doctrine*

Under the "bespeaks caution" doctrine, "alleged misrepresentations in a stock offering are immaterial as a matter of law if it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering."  Rombach, 355 F.3d at 17; see also P. Stolz Family P'Ship L.P. v. Daum, 355 F.3d 92, 96 (2d Cir. 2005) ("misrepresentation or omission will be considered immaterial if the registration statement contains cautionary language sufficiently specific to render reliance on the false or omitted statement unreasonable"); Halperin, 295 F.3d at 357 (presence of cautionary language is a relevant factor to be considered in deciding whether a reasonable investor could have been misled); Seow Lin v. Interactive Brokers Group, 574 F. Supp. 2d 408 (S.D.N.Y. 2008) ("if the alleged omission or misstatement is explicitly addressed in the risk disclosures of the offering document, it is immaterial").

Here, due to the significant cautionary language in the offering documents in connection with the $68.5 million hurricane loss estimate, any alleged misrepresentation surrounding the estimate was immaterial as a matter of law.

As more fully explicated in the factual section of this opinion, Quanta expressly and repeatedly warned investors in both the Registration Statement and the Prospectus that the reserve estimates pertaining to Hurricanes Katrina and Rita were simply "preliminary" estimates that were "inherently difficult to predict," that there was a significant reporting lag between the time when losses were incurred and the time when reliable, quantified loss information would be reported to the Company, that the estimates were subject to a "high level of uncertainty," that the exact losses would not be known for "some time," that the estimates might prove to be materially incorrect, and that adverse developments with respect to the losses could lead to a downgrade of Quanta's financial strength rating and the Company's "financial condition could be materially adversely affected."

In light of such language, which was prominent throughout the offering documents, and crucially, was specific about the risks involved, no reasonable investor could have considered the $68.5 million estimate as a guarantee of much other than a rough account of initial estimated losses from the hurricanes.  Olkey v. Hyperion 1999 Term Trust, 98 F.3d 2, 5 (2d Cir. 1996) (finding no liability where prospectus gave "prominent and specific" warnings of "exactly the risk the plaintiffs claim was not disclosed" so as to "bespeak caution"); cf. Rubinstein v. Collins, 20 F.3d 160, 171 (5th Cir. 1994) ("inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known, material, adverse facts").

Put differently, after reading the prospectus and registration as a whole, and after being informed that the estimates could materially change at any time due to new information as insurance claims were reported, no reasonable investor would have been surprised in the least to learn that two months later the loss estimates had been revised upwards by 15%.  Indeed, the Prospectus -- far from providing any assurances regarding the reliability of the $68.5 million figure -- actually emphasized that the actual losses could be much higher.[9]  See Halperin, 295 F.3d at 360 (holding that because "cautionary language addresses the relevant risk directly … neither offering memorandum was misleading"); Miller v. Lazard, 473 F. Supp. 2d 571, 583 (S.D.N.Y. 2007) (estimates in Prospectus not material because Prospectus "expressly counsel[ed] against reliance on the negotiated price as an accurate value of the shares").  Thus, in light of the significant and thorough cautionary language, the $68.5 million loss estimate is not misleading or materially untrue as a matter of law.

3. $7.5 million Pacific Energy environmental claim.

The Complaint alleges, as materially untrue, the $7.5 million net loss as of September 30, 2005 that was cited in the December 2005 offering documents, and which was "caused by an oil pipeline in California which ruptured during … the first quarter of 2005."  (Compl. ¶ 196.)  The crux of the allegation is that because the insured, Pacific Energy, had claimed an additional loss of $4.5 million related to the claim in its November 14, 2005 announcement of its third-quarter results, and as by contract Quanta was responsible for 50% of Pacific Energy's losses for this claim, Quanta's loss related to the pipeline would have necessarily and immediately increased during the third quarter

---

[9] The Company further explained that if its losses due to Hurrican Katrina proved to "be greater than currently anticipated," the Company "had no further reinsurance and retrocessional coverage available." (Ruffino Decl., Ex. L at S-24.)

by $2.25 million, for a total net loss of $9.75 million.  (Compl. ¶¶ 102, 196.)  Instead, the Complaint alleges, Quanta waited until January 10, 2006, when it announced that "based on additional information recently received from its insured, the Company has increased its estimated gross and net loss expenses in the fourth quarter of 2005 in the additional amounts of approximately … $4.9 million related to the pipeline rupture."  (Compl. ¶ 101.)

These conclusory allegations do not sufficiently demonstrate the falsity of the statement contained in the December 2005 offering documents.  The assertion that simply because Pacific Energy increased its own estimated losses, Quanta, its insurer, needed simultaneously to revise its own estimate of the amount of the insured loss is baseless.  Rather, as the offering documents clearly stated, there "always exists a reporting lag between a loss event taking place and the reporting of the loss" to Quanta.  (Ruffino Decl., Ex. K at 17; Borden Decl., Ex. B at S-58.)  The insured must first submit claim information to the insurer, who must then evaluate the grounds for the claim and determine whether it is justified under the terms of the policy, whether other entities are liable, and for what amount the insurer may be liable.  These reporting lags affect the timing of when insurers record liability because accounting rules permit the booking of a loss only when the loss is both probable and the amount of insured coverage can be reasonably estimated.  See Schick v. Earnst and Young, 808 F. Supp. 1097, 1104 n.4 (S.D.N.Y. 1992); see also Kinder, 423 F.3d at 903 (under GAAP an insurer must report loss estimates when "the amount of loss in the future can be reasonably estimated.")  Thus, the nature of the insurance business, as the Prospectus warned, determines that there will be a significant period of time between a loss event and when that event is

reflected on Quanta's books.

Alternatively, even if Quanta should have adjusted the figure in the offering documents, the size of the misstatement based on Pacific Energy's additional loss -- $2.25 million in additional liability out of total net 2005 losses of $324 million -- would render the adjustment immaterial as a matter of law.  Ganino v. Citizens Utilities, 228 F.3d 154, 166 (2d Cir. 2000) (fact may be immaterial if the information is "trivial"). Indeed, the closing price for common stock dropped only 4 cents (.75%) after Quanta did adjust its pipeline related loss by $4.9 million (not $2.25 million) on January 11, 2006. (Ruffino Decl., Ex. O at 94 [2005 annual report income statement], Ruffino Decl., Ex. P [Quanta stock price data]).[10]

4. *2005 third-quarter financial results.*

Next, the Complaint alleges that the financials Quanta recorded for the nine months ended September 30, 2005, and reprinted in the Registration Statement and Prospectus (the Company's after-tax net loss of $51.1 million, its loss ratio of 81.2%, and its total shareholders' equity of $372.2 million) were materially false and misleading as they were based on Quanta's underlying alleged misrepresentations regarding its losses on claims received to date related to hurricanes Katrina and Rita and the pipeline spill. (Compl. ¶¶ 193-94).  This claim is dismissed because, as noted, the Complaint has not adequately pled the untruth of the loss estimates for the hurricanes and the pipeline, and as a result, has not properly pled the falsity of the consequent third-quarter of 2005 statements of financial position, which incorporated those estimates.

---

[10] Although Plaintiffs do not cite this drop in stock price, it is relevant in assessing the materiality of the alleged omission.  See Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 347 (2005) (plaintiff must allege causal link between stock price drop and curative disclosure); Ganino, 228 F.3d at 166 fn. 8 (court may take judicial notice of stock prices on motion to dismiss).

Moreover, any untruth is immaterial as a matter of law because the Prospectus clearly warned investors in many places that Quanta's statement of its financial position (including its net loss, loss ratio, and shareholding reserves) -- which was calculated using the $68.5 million preliminary estimate -- could also be "significantly adversely affected" by the actual losses from the Hurricanes when the losses became known by the Company.  (Borden Decl., Ex. B at 17, 74, F-12, F-13.)  Indeed, the nature of loss reserve estimates, as explained by Quanta in the Prospectus, evinces that any loss estimate was highly subject to change.

As the Company noted, loss reserve estimates "are balance sheet liabilities representing estimates of future amount required to pay losses and loss expenses for insured and/or reinsured claims that have occurred at or before the balance sheet date." (Quanta's 12/16/2005 Prospectus at 109.)  The Company is required to establish such reserves "under applicable insurance laws and regulations and U.S. GAAP."   (Id.) However, while these reserves are the Company's "best estimates," the reserves are "subject to significant variation as the true losses become known."   (Id. at 109-110.) Accordingly, it follows logically that as the Company's loss reserve estimates change over time due to better awareness of actual losses, the Company's consequent financial statements, which reflect these loss estimates, will also change.

5. *The Aon Approved Listing.*

In the "Risk Factors" Section of the December 5, 2005 Registration Statement, Quanta commented on its relationship with Aon Corporation, writing that:

> Affiliates of at least two of our brokers through whom we market our products … Marsh and Aon Corporation, are also co-sponsors of Bermuda reinsurers that compete with us, and those brokers may decide to favor the companies they sponsored over other companies.   While our senior

> management team and underwriting officers have industry relationships
> with major industry brokers that we believe are allowing us to continue to
> establish our presence in the insurance and reinsurance markets, we cannot
> assure you that we will successfully maintain these relationships.   The
> failure to develop or maintain relationships with brokers from whom we
> expect to receive our business could have material adverse effect on us.

(Compl. ¶ 198; Ruffino Decl., Ex. K at 22.)

Later, in Quanta's 2005 Annual Report released on March 31, 2006, the Company acknowledged that it had been "removed from the approved listing from several of [its] important brokers, including two of [its] largest brokers, Aon Corporation and Marsh Inc."  (Ruffino Decl., Ex. O at 12-13.)

The Complaint first asserts that the statement concerning Aon in the Registration Statement -- that Aon was one of Quanta's brokers -- was materially false and misleading because Aon had "terminated its brokerage relationship" with Quanta by removing Quanta from its "approved listing" of insurers.   (Compl. ¶¶ 132, 199.)   But the Complaint's characterization of Aon's actions --- that it had terminated its brokerage relationship with Quanta -- is inaccurate.  Rather, as Quanta's 2005 annual report makes clear, the "approved listing is a list of insurance carriers that brokers are allowed to recommend … to the brokerage house's clients."  (Ruffino Decl., Ex. O at 13.)  Thus, the removal of an insurance carrier from a broker's "approved listing" does not constitute a termination of the brokerage relationship.  Rather, as the Complaint explains, after Aon removed Quanta from its approved listing, Aon's clients were still free to use Quanta for future insurance as long as they signed a "waiver" to "protect Aon from liability." (Compl. ¶ 137.)  The brokerage relationship would still continue, all that would change is that Aon would no longer actively recommend Quanta to clients.

In any event of how it is characterized, the crux of the Aon approved listing

allegation in the Complaint is that the Company had learned prior to the filing of the offering documents in mid-December 2005 that Aon had removed Quanta from its "approved listing" because A.M. Best had placed Quanta on its negative watch list, and that Quanta's failure to put this information in the offering documents was a material omission.  (Compl. ¶¶ 132, 144, 199.)   Defendants do not deny that if the allegations concerning the Aon approved listing in the Complaint are true, then neither the Prospectus nor the Registration Statement contained the fact that Quanta had been dropped from Aon's approved listing.  Rather, Defendants primary argument is that the Company was under no duty to disclose this information in the Offering Documents.

A "corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." In re Time Warner Sec. Litig. (ZVI Trading Corp. v. Ross), 9 F.3d 259, 267 (2d Cir. 1993).  Rather, to be actionable, an omission from the offering documents must involve information that the defendant had a duty to disclose.  See In re Time Warner, 9 F.3d at 267; In re Merrill Lynch & Co., Inc., 272 F. Supp. 2d 243, 248 (S.D.N.Y. 2003) ("To state a claim under Sections 11 and 12(a)(2) [of the Securities Act], a plaintiff must allege that defendants had a legal obligation to disclose the allegedly omitted information.")  In the case of an omission, a duty to disclose arises either (1) through an explicit regulatory or statutory requirement, or (2) when the omitted information is otherwise "material." In re Time Warner, 9 F.3d at 267.  Materiality is determined as of the date the offering document became effective. Nelson v. Paramount, 872 F. Supp. 1242, 1246 (S.D.N.Y. 2004).

The Complaint here does not allege that there was an explicit regulatory or statutory requirement mandating the disclosure of the Aon "approved listing"

information.  Rather, the Complaint maintains that the removal of Quanta from Aon's "approved listing" was material, and therefore, should have been disclosed.  To buttress this claim, the Complaint quotes from the Company's 2005 10-K, which explained that Aon was one of the Company's "largest" broker, as well as an "important" broker. (Compl. ¶ 131.)  The Complaint also relies upon a Quanta employee, who maintained that Aon was Quanta's "second largest" insurance broker at the time the offering documents were filed.  (Compl. ¶ 139.)  The nub of this allegation is that the removal of the Company from Aon's approved listing was material because Aon accounted for a large portion of the Company's business.

Initially, while the Complaint makes much of Confidential Witness One's ("CW1") belief that Aon was Quanta's "second largest" insurance broker, even accepting CW1's allegation as fact, Aon still accounted for a relatively small percentage of the Company's business.  As the 2005 annual report makes clear, during "the year ended December 31, 2005, 15.0% of [the Company's] gross premiums [revenues] were generated by one broker.  No other broker account for more than 10% of gross premiums written…"  (Ruffino Decl., Ex. O at 55.)  The Complaint does not challenge the truth of the aforementioned figures.  Thus, even if Aon was Quanta's second-largest insurance broker as the Complaint charges, at the very most, it represented less than 10% of the Company's gross revenues.

But more importantly, at the time the offering documents were filed in mid-December of 2005, the removal of Quanta from Aon's "approved listing" had not materially changed the structure of Aon's business relationship with Quanta.  As noted, the "approved listing is a list of insurance carriers that brokers are allowed to

recommend" to the "brokerage house's clients." (Ruffino Decl., Ex. O at 13.) Put simply, the removal from a broker's approved listing does not require clients to terminate their relationship with Quanta or use a different insurance carrier. Instead, when an insurance carrier is taken off the "approved listing," the "insured client may request a change to another insurance carrier" or it could just "stay with Quanta" if it signed a "waiver of liability." (Compl. ¶¶ 136-37, 149.) Thus, even if Aon accounted for 10% of Quanta's business, the removal of the Company from the "approved listing" would not have resulted in the loss of the entirety of that business.

This conclusion that Quanta had not suffered from a material loss of revenues is buttressed by the allegations contained in the Complaint. At the time when the Registration Statement was printed in mid-December, which is the point at which the materiality of the omission must be determined, the impact of Quanta's removal from Aon's approved listing on the Company's finances had been slight. In fact, to demonstrate loss of business to Quanta, the Complaint points to the "anticipated" loss of only $2 to $3 million in revenue from a single division out of $610 million in total gross premiums (Compl. ¶ 135; Ruffino Decl., Ex. O at 94), and it alleges in only general terms that other "divisions also lost business as a result of Aon's action against Quanta." (Compl. ¶ 135.) The Complaint fails to cite to a single specific loss that the Company had suffered at the time when the offering documents were filed in mid-December 2005 that was a result of its removal from Aon's approved listing.[11] This hardly suffices to establish that the removal of Quanta from Aon's approved listing was a material fact that

---

[11] The Complaint does allege that Quanta had failed to win new insurance business from Aon as a result of the removal from the "approved listing." (Compl. ¶ 138.) The Complaint gives the example of General Electric, which in "February 2006," had "refused to use Quanta." (Id.) However, as explained, materiality is judged at the time the statement was printed in the offering documents, which in this case was December of 2005. The Complaint's attempt to rely on future events to prove past materiality is rejected.

needed to be disclosed at the time of the offering.

Moreover, the confidential witnesses the Complaint relies upon expected that the imminent capital infusion from the secondary offering would result in the Company's removal from A.M. Best's "negative watch" list, which, in turn, would result in Quanta being restored to Aon's approved listing.  (Compl. ¶¶ 135, 147.)  Thus, at the time the offering documents were filed in mid-December of 2005, days before the secondary offering, the Company believed that Quanta would soon be restored to Aon's approved listing with little, if any, interruption to the Company's business.   Indeed, Quanta emphasized in the Prospectus that after it completed the secondary offering, "based on the [Company's] discussions with A.M. Best, [the Company] believe[d] that A.M. Best will conclude its review [and] remove [Quanta] from negative watch..."  (Ruffino Decl., Ex. K at 15.)  This would result in Quanta being placed back on Aon's approved list.

Subsequent events, which included the further deterioration of Quanta's financial situation in the few months subsequent to the secondary offerings and the failure of A.M. Best to remove Quanta from negative watch, do not render the omission material at the time the offering documents were filed.  See Nelson, 872 F. Supp. at 1246 ("while events subsequent to the date of the Registration Statement may have been material," Securities Act claims are limited to omissions in offering documents that were material "when such parts became effective.")  Further, that the Company announced in its 2005 annual report that it had "been removed from the approved listing from several of [its] important brokers, including two of [its] largest brokers, Aon Corporation and Marsh Inc," illustrates that it was not the singular delisting from Aon that was important, but rather A.M Best's decision to downgrade Quanta and the cumulative removal by "several of

[its] important brokers" from their approved listings that rendered such events material.

Lastly, the failure of Quanta to disclose in the offering documents that Aon removed it from its approved listing was immaterial because, under the bespeaks caution doctrine, the offering documents clearly stated that because A.M. Best "placed [Quanta's] financial strength rating under review with negative implications," the Company "expect[ed]" that this would "adversely affect [Quanta's] business, [its] opportunities to write new and renewal business and [its ability] to retain key employees."   (Ruffino Decl., Ex. I at 15, 95; Ex. K at 15, 95.)  This warning directly addressed the issue raised by the Complaint here, which is that Quanta's ability to write new and renewal business would be directly affected by the removal of Quanta from Aon's approved listing.  See P. Stolz Family P'Ship L.P., 355 F.3d at 96 ("misrepresentation or omission will be considered immaterial if the registration statement contains cautionary language sufficiently specific to render reliance on the false or omitted statement unreasonable"). Thus, for this reason too, the significant cautionary language in the offering documents rendered any alleged omission immaterial as a matter of law.

Hence, the Complaint has failed to adequately allege that its removal from Aon's approved listing was material at the time the offering documents were filed, and therefore, the Company was under no obligation to put such information in the offering documents.

6. *Conclusion*

Because the Complaint here has not put forth sufficient factual allegations such that the Court finds it "plausible" that either the Prospectus or Registration Statement contained any material untruths or omissions, the Complaint's Securities Act claims are

dismissed.  Twombly, 127 S. Ct. at 1965 ("allegations must be enough to raise a right to relief above the speculative level").[12]

B. Exchange Act of 1934 Violations

    1. Applicable Law

    To state a cause of action under Section 10(b) of the Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, a complaint must allege that defendants: 1) in connection with a purchase or sale of securities; 2) with *scienter*; 3) made a material false representation or omitted to disclose material information; 4) upon which plaintiff relied; and 5) proximately caused plaintiff injury.  Lentell v. Merrill Lynch, 396 F.3d 161, 172 (2d Cir. 2005).  The standard for assessing materiality under the Exchange Act is the same as under the Securities Act.  See I. Meyer Pincus & Assocs. V. Oppenheimer & Co., 936 F.2d 759, 761 (2d Cir. 1991).  The requisite state of mind, or *scienter*, in an action under Section 10(b) and Rule 10b-5 is "an intent to deceive, manipulate or defraud."  Ganino, 228 F.3d at 168.

    Relatedly, to plead a claim under Section 20(a) of the Exchange Act, a complaint must allege 1) a primary violation of the Act by a controlled person and 2) direct or indirect control by the defendant of the primary violator, and 3) "culpable participation." See In re Adelphia Communications, 2007 U.S. Dist. LEXIS 66911 (S.D.N.Y. 2007); In re Globalstar Sec. Litig., 2003 U.S. Dist. LEXIS 22496, at *12 (S.D.N.Y. 2003) (to withstand motion to dismiss Section 20(a) claim, complaint must "show that the controlling person was in some meaningful sense a culpable participant in the fraud

---

[12] Because this Court is dismissing the Complaint's Securities Act claims in full, there is no need to consider the underwriters' (Defendants FBR and BB&T) alternative arguments that Plaintiffs' claims against the underwriters are both time and procedurally barred.  See Nature's First, Inc. v. Nature's First Law, 436 F. Supp. 2d 368, 374 (S.D.N.Y. 2006) (Second Circuit prefers the "resolution of suits on the merits.")

perpetrated by the controlled person").

a. *Pleading Requirements for Securities Fraud*

Exchange Act claims sound in fraud, and therefore, are subject to the heightened pleading requirements of Rule 9(b), which, as described, <u>supra</u>, requires that whenever a complaint contains allegations of fraud, the circumstances constituting fraud shall be stated with particularity. <u>See</u> Fed. R. Civ. P. 9(b); <u>Chill</u>, 101 F.3d at 267 (noting that the fraudulent statements or conduct must be stated with particularity). Similarly, securities fraud allegations are subject to the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA") of 1995. <u>ATSI Communications</u>, 493 F.3d at 98.

The PSLRA requires securities fraud complaints to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. 78u-4(b)(1); <u>ATSI Communications</u>, 493 F.3d at 99. While the PSLRA does not require plaintiffs to plead "every single fact upon which their beliefs concerning false or misleading statements are based," it does require the facts alleged to be "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." <u>Novak v. Kasaks</u>, 26 F.3d 300, 313-14 fn. 1 (2d Cir. 2000).

Lastly, the Second Circuit does not recognize "fraud by hindsight." <u>Shields</u>, 25 F.3d at 1129; <u>In re Carter Wallace Securities Litigation</u>, 220 F.3d 36, 42 (2d Cir. 2000). "Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." <u>Stevelman v. Alias Research</u>, Inc., 174 F.3d

79, 84 (2d Cir. 1999).

> b. *Scienter*

To satisfy the Rule 9(b) and the PSLRA pleading requirements with respect to the *scienter* element of a Exchange Act of 1934 claim, a complaint, with respect to each alleged fraudulent act or omission, must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  See ATSI Communications, 493 F.3d at 99.  In "determining whether the pleaded facts give rise to a 'strong' inference of *scienter*, the court must take into account plausible opposing inferences."  ATSI, 493 F.3d at 99 (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007)).  For an inference of *scienter* to be strong, "a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  ATSI Communications, 493 F.3d at 99.

*Scienter* can be pled by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  ATSI, 493 F.3d at 99; see also Press v. Chemical Services Corp., 166 F.3d 529, 537-38 (2d Cir. 1999).  "Sufficient motive allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."  Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001).  Motives that are "generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud."  Id.

To establish strong circumstantial evidence of *scienter*, a plaintiff must allege facts showing "conduct which is highly unreasonable and which represents an extreme

departure from the standards of ordinary care to the extent that the danger was either known to the defendants or so obvious that the defendant must have been aware of it." In re Carter-Wallace, Inc., Sec. Lit., 220 F.3d at 42.  This high standard may be met where defendants (1) "engaged in deliberately illegal behavior"; (2) "knew facts or had access to information suggesting that their public statements were not accurate;" or (3) "failed to check information they had a duty to monitor." Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000).

Further, where the plaintiff pleads *scienter* by conscious misbehavior or recklessness, "the strength of the circumstantial allegations must be correspondingly greater." Medis Investor Group v. Medis Techs., 2008 U.S. Dist. LEXIS 62866, at *14 (S.D.N.Y. 2008) (quoting Kalnit, 264 F.3d at 142); see also In re Bayou Hedge Fund Litig., 534 F. Supp. 2d 405, 415 (S.D.N.Y. 2007) (noting that "the strength of the recklessness allegations must be greater than that of allegations of garden-variety fraud, and the inference of recklessness must be at least as compelling as any opposing inferences").  Allegations based on recklessness have sufficed only "when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." Novak, 216 F.3d at 308.

2. Application

The Securities Act claims rejected above related solely to statements and an omission included in Defendants' December 2005 offering documents.  However, the Complaint also alleges that Defendants Quanta, Russ, Lippincott, and Dodd committed securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder based on statements made in press releases,

conference calls, and quarterly earnings statements in the two months leading up to when Quanta reported its fiscal 2005 third-quarter results on November 14, 2005.  (Compl. ¶¶ 170-199.)

Specifically, the Complaint alleges that prior to the issuance of the Company's third-quarter 2005 results, the aforementioned Defendants already knew, or had recklessly disregarded, that Quanta: 1) booked inadequate reserves for both the hurricane losses and the pipeline spill (Compl. ¶¶ 89-103; 104-123); 2) failed to be sufficiently conservative when booking loss reserves generally, resulting in an $8-$13 million "reserve strengthening charge" (Id. ¶¶ 162-163); 3) maintained virtually non-existent internal controls that could provide any reasonable assurances that loss reserves complied with generally accepted accounting principles ("GAAP")  (Id. ¶ 168), and; 4) that AON had dropped Quanta from its approved listing.  (Id. ¶¶ 128-151.)

In response to these allegations, Defendants argue that the Complaint's 10b-5 claim should be dismissed because the allegations do not support a strong inference of *scienter*.  Specifically, Defendants assert that the Complaint's circumstantial evidence allegations of fraud fail because the Complaint does not allege facts from which one could infer that Defendants had information contradicting the statements they made at the time they made them.[13]

     a. *The Allegedly Misleading Statements and Whether Defendants Knew or Should Have Known They Were Misleading.*

To state a claim under Section 10(b) and Rule 10b-5, a complaint must sufficiently and with particularity allege that a defendant acted with *scienter*.  The

---

[13] Many of these allegedly fraudulent statements relate to the allegedly false statements contained in the offering documents.  Thus, as both the Securities Act claims and the Exchange Act claims require a material misstatement or omission to be sufficiently pled, for the same reasons that the Complaint's allegations of misrepresentations fail to support a claim under Section 11 and 12(a)(2), most of the alleged fraudulent statements made prior to the secondary offering similarly fail to support a claim under Section 10(b) and Rule 10b-5.

Complaint attempts to plead *scienter* in this case by alleging that Defendant Quanta or the individual Defendants "knew facts or had access to information suggesting that their public statements were not accurate."  (Compl. ¶¶ 228-257.)  <u>Novak</u>, 216 F.3d at 311 ("securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information").[14]   In such situations, "the *scienter* analysis and the determination of whether the defendant made false or misleading statements are essentially combined."  <u>In re Flag Telecom Holdings</u>, 308 F. Supp. 2d at 259.  Therefore, this Court will consider each category of misstatement and determine whether plaintiff has pleaded facts demonstrating that the statement or omission was false or misleading and that Quanta and the individual Defendants had access to information indicating that it was.

### i. <u>Allegations about Pipeline and Hurricane Reserves</u>

The crux of the Complaint's *scienter* allegations with regard to the 2005 hurricane loss reserves is that in the months following Hurricane Rita, the Company did not change its loss reserve estimates, and it was not until March 2006, six months after Hurricane Rita struck, that the Company announced an additional $17.4 million business interruption claim related to that Hurricane. (Compl. ¶¶ 159-60).  Similarly, in alleging *scienter* for the pipeline claim, the Complaint points to the "long history of the claim, the ongoing remediation of the oil spill, and the remaining exposure from the $25 million net limit on the policy."  (Compl. ¶ 245.)  In essence, the Complaint's factual allegations

---

[14] The Complaint also argues that Defendants possessed a motive to commit the securities fraud by virtue of Quanta's critical need to maintain the A.M. Best "A-" rating.  (Compl. ¶¶59-75.)  Only by pushing losses from the 2005 third quarter to the fourth quarter were Defendants able to artificially inflate Quanta's financial results and thereby keep the "A-" rating needed to obtain additional capital through the Secondary Offerings and remain compliant with Quanta's Credit Agreement.  (<u>Id.</u> ¶¶ 29-30, 65, 124-25.)  However, as explained, <u>supra</u>, such conclusory allegations of a motivation to preserve an issuer's credit rating in order to raise capital are insufficient as matter of law to demonstrate *scienter*.  <u>See</u> <u>San Leandro</u>, 75 F.3d at 814.

about reserves boil down to the claim that Quanta announced loss estimates, and then revised the estimates upward later on.  See, e.g., Compl. ¶¶ 89, 94, 101, 157 (reserves for oil pipeline leak increased over time); id. ¶¶ 109, 116, 157 (reserves for hurricanes Katrina and Rita increased over time).

This pleading is insufficient to establish *scienter.*  As noted, a complaint must "specifically allege[] defendants' knowledge of facts or access to information" contradicting the Company's public statements.  See Silva Run World Ltd. v. Bear Stearns & Co., 2000 U.S. Dist. LEXIS 16026 (S.D.N.Y. 2000) ("to establish *scienter* in misrepresentation cases, facts must be alleged which particularize how and why each defendant actually knew, or was reckless in not knowing, that the statements were false at the time made).  Simply put, because the Complaint alleges no specific facts demonstrating that Defendants possessed -- at the time they made the allegedly false statements concerning the reserve amounts -- information contradicting their statements, fraud has not been shown.  See, e.g., Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978) (affirming dismissal of securities fraud complaint which simply "seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones"); see also Acito v. IMCERA Group, 47 F.3d 47, 53 (2d Cir. 1995) ("[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.")

Moreover, as pertains to the 2005 hurricane loss estimates, the Complaint's attempt to plead fraud by hindsight is particularly meritless here.  See Shields, 25 F.3d at 1124 (securities fraud claim dismissed where plaintiff alleged no particularized facts showing that the revised earnings were known to the issuer at an earlier date).  The 2005

hurricane season, which included both Katrina and Rita, caused an unprecedented amount of damage.  No reasonable investor would have surmised that precise loss impacts could be ascertained immediately after the storms ended.  The Company repeatedly emphasized this point in multiple post-hurricane disclosures, informing investors that the reserves initially reported were estimates, that the estimates were subject to significant uncertainty, that there was always a lag between a loss event and the reporting of the loss to the insurer, and that the reserve estimates could materially change.  (Ruffino Decl. Exs. D; F; H at 13, 32, 35-36, 39-40, 49, 56; J at 14, 17, 49.)  The Complaint alleges nothing to show that the reserves did not have a reasonable basis at the time they were made, and just because the Company later turned out to have underestimated hurricane losses by 15% does not support an inference of fraud.  See Searls v. Glasser, 64 F.3d 1061, 1066 (7th Cir. 1995) (as long as reserves have a reasonable basis when they are made, a 10b-5 claim will not lie because "an inability to foresee the future does not constitute fraud."); In re Symbol Tech. Class Action Litig., 950 F. Supp. 1237, 1246 (E.D.N.Y. 1997) (loss estimate does not lack reasonable basis just because it turns out to be wrong later on).[15]

Nor does the fact that Defendant Quanta had repeatedly told investors that the estimate of loss reserves was based on a "detailed review of affected contacts and discussion with clients, cedants and brokers," and that Quanta had "scrubbed" its reserves and had been "very conservative" when it booked losses, support the inference that the Company necessarily would have known about the additional $17.4 million loss resulting from a single business interruption claim in the months leading up to when the Company

---

[15] Moreover, that Quanta also later revised its 2004 hurricane loss estimates does not establish some type of fraudulent pattern where the Company booked "inadequate reserves and pushed losses to the fourth quarter … after which the Company replaced the lost capital through private offerings" to satisfy A.M. Best. (Compl. ¶¶76-83.)  The Complaint alleges no facts establishing that the loss estimates initially recorded for the 2004 hurricane season were unreasonable estimates at the time they were made.

reported the loss on March 2, 2006 or about the additional $2.25 million loss from the Pacific Energy Pipeline leak in the months leading up to when it reported a different higher loss adjustment on January 10, 2006.   (Compl. ¶¶ 241, 246, 249.)   As the Company repeatedly warned investors, it relies on its insured to report information about losses, and there is always a reporting lag between the time when losses are incurred and the time when they are reported to and evaluated by Quanta.

Further, with regard to the hurricane losses, the Company emphasized that the $68.5 million estimate was a "preliminary" figure which was subject to "significant uncertainty."  (Ruffino Decl. Ex. H at 13-14.)   Because of these significant publicized uncertainties, as well as the fact that the hurricanes were major national catastrophes resulting in an unprecedented level of damage and disruption, Quanta's claim that it did not receive information from its insured about the $17.4 million offshore business interruption claim cited in the Complaint until "early 2006" (Ruffino Decl. Ex. N at 10; Compl. ¶¶ 246-47) was credible, and the Complaint sets forth no basis to challenge this fact, even in light of the Company's statement that it had "scrubbed" the loss reserves and had based its reserve estimates on a "detailed review" of its insurance contracts.

Lastly, and contrary to the Complaint's suggestion, that Pacific Energy announced an increase in its own estimate for clean-up costs on November 14, 2005 does not support an inference that the Company realized this additional loss and should have increased its reserve for the pipeline loss on that date as well (instead of waiting until January 2006). (Compl. ¶¶ 102-03, 245.)  As the Company explained to investors, "significant periods of time often elapse between the occurrence on an insured loss, the reporting of the loss to an insurer and payment by the insurer of that loss."  (Ruffino Decl. Ex. K at 17.)  The

Complaint's allegations ignore the reality that before an insurer can confirm a particular dollar amount of liability it must receive claim information from its insured and take an appropriate amount of time to investigate the details of the basis for the claim and evaluate the information.  See Schick, 808 F. Supp. at 1104 n.4 (accounting rules permit the booking of a loss only when the loss is both probable and can be reasonably estimated).  Merely because the insured calculated some additional losses, it does not necessarily follow that those losses will be automatically, and immediately, borne by the insurer.

Accordingly, because the Complaint does little more than note that the later announcements about reserve losses differed from earlier ones, the Complaint has not shown with any particularity that the Company's reserve estimates were false and that Defendants knew that they were false.

### ii. $8 to $13 Million of General Reserve Strengthening Charges

The Complaint also sees fraud in Quanta's March 2, 2006 announcement that it expected to take additional charges in the range of $8 million to $13 million for "general reserve strengthening" in connection with closing its books for the 2005 fiscal year. (Compl. ¶¶162-63.)   But the Complaint's factual allegations point to no evidence indicating that any component of this increase in reserves was known in earlier periods or was intentionally concealed.  The Complaint's entirely conclusory allegations do not meet the particularity requirements of Rule 9(b) and the PSLRA.

### iii. Internal Control Weaknesses as a Basis for Inferring Scienter

In mid-November of 2005, Defendants Russ and Dodd signed Sarbanes-Oxley ("SOX") certifications attesting that they had established and evaluated disclosure

controls and procedures for Quanta.  (Compl. ¶¶ 179-80, 233, 243).  In Quanta's Form 10-K that it filed on March 31, 2006, the Company disclosure that it had it had internal control problems pertaining to the Company's failure to maintain sufficient accounting personnel and effective controls over the accuracy of financial spreadsheets and account reconciliations.  The Complaint asserts that this "admission" of internal control problems "directly contradicts" the SOX certifications the Company's officers signed nearly five months earlier.  (Compl. ¶¶ 180, 234.)  The Complaint charges that this "materially false and misleading" statement by Defendants that they had established and evaluated disclosure controls and procedures for Quanta gives rise to a "strong inference" that Defendants had "knowledge of the falsity of the materially misleading financial results reported in the 3Q 2005 10-Q" released on November 4, 2005, as well as the "materially misleading financial reports reported" in the mid-December 2005 offering documents. (Id. ¶ 234.)

But even accepting the Complaint's argument that Quanta's disclosure of internal control problems on March 31, 2006, rendered the Company's SOX certifications, signed nearly five months earlier, materially false and misleading, it does not follow that the Company knowingly withheld the true financial results in November and December of 2005, when the third-quarter results and offering documents were released.  In that regard, the Complaint has failed to show that the third-quarter of 2005 financial results, which were contained in the offering documents, were "materially misleading" or untrue. Indeed, even after the internal control problems were reported at the end of March, 2006, none of the control weaknesses led to a restatement of the Company's previously given financial statements.  (Ruffino Decl., Ex. O at 140-143.)  Because the Complaint has

failed to show that the resultant third-quarter or year-end of 2005 financial statements were untrue, these allegations of fraud based on the veracity of those statements contained in the SOX certifications are rejected.

Moreover, it is well-settled that "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." Novak, 216 F.3d at 309; In re Scottish Group, 524 F. Supp. 2d at 391. Such allegations are sufficient only when they "are coupled with evidence of corresponding fraudulent intent." Novak, 216 F.3d at 309. Here, the Complaint attempts to draw a broad link, with no supportive facts, between the signing of SOX certifications, the disclosure five months later of internal control problems, and allegedly false financials. These facts, which rely entirely on conjecture, are not indicative of fraudulent intent.

### iv. Allegations about Aon's "Approved Listing"

Lastly, the Complaint alleges in credible and corroborated detail that Defendants knew prior to the December 2005 secondary offerings that Aon had dropped Quanta from its list of approved insurers. (Compl. ¶¶ 128-151.) The Complaint further asserts that the failure of Defendants to acknowledge in the offering documents that Quanta had been removed from Aon's approved listing demonstrated Defendants' *scienter* with respect to their desire to mislead investors regarding Quanta's financial health. (Compl. ¶¶ 249-56.)

However, as explained in detail, supra, any omission in this regard was immaterial as a matter of law. In addition to failing to sufficiently plead materiality, the Complaint has also failed to adequately allege loss causation -- i.e. a causal connection between the material misrepresentation or omission and plaintiff's loss -- with respect to the omission concerning the Aon approved listing. See Dura Pharms., Inc. v. Broudo,

544 U.S. 336, 342 (2005) ("loss causation" is a required element of a Section 10(b) Exchange Act claim); Lentell v. Merrill Lynch, 396 F.3d 161, 172 (2d Cir. 2005) (to establish loss causation, plaintiff must establish that the omission concealed something from the market that, when disclosed, negatively affected the value of the stock); cf. In re Flag Telecom Holdings, 411 F. Supp. 2d 377, 382 (S.D.N.Y. 2006) (a plaintiff is not required to plead loss causation under the Securities Act; rather, the absence of loss causation is an affirmative defense, and the burden of proving "negative causation" falls on defendants).

In support of its claim that the omission concerning Aon caused Plaintiff economic harm, the Complaint alleges that Quanta's stock price fell 40% on March 2, 2006 when the Company issued a press release reporting net written premiums for the fourth quarter of 2005 of only $3.8 million, a sharp decline from the fourth quarter of 2004.  (Compl. ¶¶ 150, 263.)  From this, the Complaint suggests -- with no factual support -- that the decline in net written premiums was due to the Company's removal from Aon's approved listing.

However, the Complaint's reliance on the March 2, 2006 stock price decline to prove loss causation here is misplaced because the information concerning the Aon approved listing was not released by the Company until March 31, 2006, nearly a month after the March 2, 2006 report.  And it is well-settled under the law of this Circuit that price declines *prior* to the public disclosure of an omission may not be used to support a theory of loss causation.  See Akerman v. Oryx Communications, 810 F.2d 336, 342 (2d Cir. 1987); In re Merrill Lynch Sec. Litig., 272 F. Supp. 2d 243 (S.D.N.Y. 2003). Moreover, in the same March 2, 2006 press release that the Complaint relies upon,

Quanta announced: the additional losses from the 2005 hurricane season, a much larger than expected fourth quarter of 2005 loss, and, that A.M. Best had officially downgraded the Company's financial strength rating.  (Compl. ¶ 150.)  Thus, there is no indication that the Company's stock price decline was due to any lost business from Aon.

The Complaint further alleges loss causation due to Quanta stock's 10% decline on March 31, 2006, when the Company announced that it had "been removed from the approved listing of several of [the Company's] important brokers, including Aon Corporation and Marsh Inc."  (Compl. ¶¶ 151, 264.)  But while the Complaint ascribes this loss solely to the information concerning the Aon approved listing, it is apparent from the face of the announcement that the Company had been removed from "several" approved listings, of which Aon was only one.  It is impossible to ascribe the 10% stock price decline solely to Aon.  Moreover, this disclosure concerning the approved listings was not made in a separate press release, but rather was included in the Company's 2005 annual report, which fully explicated A.M. Best's downgrading and the Company's declining business prospects.  Simply put, the Company's stock price decline could have been due to any number of reasons contained within the annual report.  Thus, the Complaint has failed to adequately prove loss causation so as to support the Exchange Act securities fraud claim.

Hence, the Complaint's allegation of securities fraud based on the Aon approved listing is dismissed because the Complaint failed to adequately allege materiality and as well as loss causation.

3. <u>Conclusion</u>

Accordingly, Defendants' motion to dismiss the Complaint's Section 10(b) and

Rule 10b-5 claim is granted. [16]  Further, because the Complaint fails to allege a primary

violation of the Exchange Act by a controlled person, Defendants' motion to dismiss the

Section 20(a) claim is also granted.

## V. CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are granted in full and

the Complaint is dismissed.

IT IS SO ORDERED.

Dated: New York, New York
       January 23 2009

Robert P. Patterson, Jr.
U.S.D.J.

---

[16] The Complaint also alleges fraud based solely on the fact that Quanta director Wallace Timmeny did not sign the Registration statement, and in fact, resigned from the Board immediately following the secondary offering. (Compl. ¶ 248.) But the Complaint alleges no basis to infer that he failed to sign because of any lack of confidence in the accuracy of the statements therein. The Securities Act does not require that every director of the issuer sign the registration statement. (15 U.S.C. 77f(a) (only a majority of directors must sign). Further, if Director Timmeny had been unable to do the due diligence required of directors signing a registration statement, his failure to sign the registration statement would not be inferential of *scienter*.

Copies of this Opinion and Order sent to:

*For Plaintiff Zirkin-Cutler and putative class of preferred shareholders*:

Francis P. Karam
U. Seth Ottensoser
Joseph R. Seidman, Jr.
BERNSTEIN LIEBHARD & LIFSHITZ LLP
10 East 40th Street, 22nd Floor
New York, New York 10016
Telephone: (212) 779-1414

*For Plaintiff Washington State Plumbing and putative class of common shareholders*:

Ira A. Schochet
David J. Goldsmith
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700

John A. Kehoe
Benjamin J. Hinerfeld
SCHIFFRIN BARROWAY TOPAZ & KESSLER LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706

*For Defendants Friedman, Billings, Ramsey & Co. and BB&T*

George A. Borden
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, Northwest
Washington, District of Columbia 20005
Telephone: (202) 434-5000

*For Defendants Quanta Capital Holdings, Tobey Russ, James Ritchie, Jonathan Dodd, Robert Lippincott, Michael Murphy, Nigel Morris, and W. Russell Ramsey*

Andrew Ruffino
Michael A. Schlanger
COVINGTON AND BURLING
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 841-1000